**No. 13-2215**

IN THE UNITED STATES COURT
OF APPEALS FOR THE FOURTH CIRCUIT

———————————————

DEFENDERS OF WILDLIFE and
NATIONAL WILDLIFE REFUGE ASSOCIATION,
*Plaintiffs-Appellants*,

*v.*

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION;
ANTHONY J. TATA, Secretary, North Carolina Department of Transportation;
FEDERAL HIGHWAY ADMINISTRATION; and JOHN F. SULLIVAN, III,
Division Administrator, Federal Highway Administration,
*Defendants-Appellees*,

CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION,
*Intervenor/Defendant-Appellee*.

———————————————

On Appeal from the U.S. District Court
for the Eastern District of North Carolina

———————————————

**PAGE-PROOF JOINT ANSWERING BRIEF FOR DEFENDANTS**

ROY COOPER
 Attorney General of North Carolina

JOHN F. MADDREY
 Solicitor General of North Carolina

SCOTT T. SLUSSER
 Special Deputy Attorney General
THOMAS D. HENRY
 Assistant Attorney General
COLIN A. JUSTICE
 Assistant Attorney General
 N.C. Department of Justice
 1505 Mail Service Center
 Raleigh, NC 27699-1505
 (919) 707-4480

ETHAN G. SHENKMAN
 Acting Principal Deputy Assistant
 Attorney General

THOMAS G. WALKER
 United States Attorney
 Eastern District of North Carolina

MATTHEW L. FESAK
 Assistant U.S. Attorney

ROBERT J. LUNDMAN
 U.S. Dept. of Justice
 Environment & Natural Res. Div.
 P.O. Box 7415
 Washington, DC 20044
 (202) 514-2496

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSES ...........................................................1

STATEMENT OF THE CASE AND FACTS .........................................2

    A.    Overview ...................................................................2

    B.    Statutory Background.................................................3

        1.    The National Environmental Policy Act....................................3

        2.    Section 4(f) of the Department of Transportation Act...............4

    C.    Factual Background.................................................5

        1.    The Bonner Bridge and Highway 12 .........................................5

        2.    Environmental Analysis and Planning for Bridge Replacement.........................................................9

            a.    Initial Planning in the 1990's..........................................9

            b.    Drafts and Final EIS, 2001-2008...................................11

            c.    Revising the Preferred Alternative – the EA and the Revised Section 4(f) Evaluation, 2008-2010.................15

            d.    The Record of Decision, 2010 .......................................18

    D.    The District Court Proceedings  .........................................21

SUMMARY OF ARGUMENT .............................................................23

STANDARD OF REVIEW ................................................................26

ARGUMENT ....................................................................................27

I.   THE AGENCIES DID NOT IMPROPERLY SEGMENT THEIR
     NEPA ANALYSIS............................................................................27

     A.   The Agencies' NEPA Analysis Evaluated Options for the
          Entire Highway, Not Just Replacing the Bridge, and
          Thus the Analysis is Not Improperly Segmented ....................28

     B.   Even Assuming that the Anti-Segmentation Rule Applies to
          the ROD, the ROD Does Not Violate NEPA ...........................33

          1.   The replacement bridge has logical termini ..................34

          2.   The replacement bridge has independent utility.............35

          3.   The replacement bridge does not restrict the
               consideration of alternatives...........................................37

II.  FHWA COMPLIED WITH DEPARTMENT OF
     TRANSPORATION ACT SECTION 4(F).........................................39

     A.   FHWA Properly Analyzed the Use of Protected Properties
          in Its Revised Section 4(F) Evaluation ...................................41

     B.   The Agencies Properly Rejected the Pamlico Sound Corridor
          Because It Was Not a Prudent Avoidance Alternative............44

     C.   The Selected Alternative Complies with the "All Possible
          Planning" and "Least Overall Harm" Requirements...............51

     D.   The Record of Decision is Supported by a Complete,
          Thorough, and Lawful Section 4(f) Evaluation .......................57

CONCLUSION ................................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVCE

# TABLE OF AUTHORITIES

## CASES:

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
  462 U.S. 87 (1983)....................................................................51, 57

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991)......................................................52

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)....................................................26, 39, 40, 51

*Coalition for Responsible Regional Development v. Brinegar*,
  518 F.2d 522 (4th Cir. 1975) .................................................49, 50

*Coalition on Sensible Transp., Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987)......................................34, 39, 40, 52

*Coalition on W. Valley Nuclear Wastes v. Chu*,
  592 F.3d 306 (2d Cir. 2009) .........................................................27

*Conservation Law Found. v. FHWA*,
  24 F.3d 1465 (1st Cir. 1994)................................................ 34-36, 52

*Corridor H Alternatives, Inc. v. Slater*,
  166 F.3d 368 (D.C. Cir. 1999)................................................57, 59

*Defenders of Wildlife v. U.S. Dep't of the Navy*,
  733 F.3d 1106 (11th Cir. 2013) .............................................30, 31

*Department of Transp. v. Public Citizen*,
  541 U.S. 752 (2004)..........................................................................4, 30

*Dist. Mem'l Hosp. of Southwestern N.C., Inc. v. Thompson*,
  364 F.3d 513 (4th Cir. 2004) ........................................................57

*Druid Hills Civic Ass'n v. FHWA*,
  772 F.2d 700 (11th Cir. 1985) .....................................................52

*Eagle Found., Inc. v. Dole*,
   813 F.2d 798 (7th Cir. 1987) .........................................................40

*Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*,
   374 F. Supp. 2d 1116 (S.D. Fla. 2005) ....................................35, 36

*Hickory Neighborhood Defense League v. Skinner*,
   893 F.2d 58, 60 (4th Cir. 1990) ....................................................40

*Hickory Neighborhood Defense League v. Skinner*,
   910 F.2d 159 (4th Cir. 1990) ...................................................39, 40

*Highway J Citizens Group v. Mineta*,
   349 F.3d 938 (7th Cir. 2003) (en banc) ......................26, 33, 36, 37

*Historic Preservation Guild of Bay View v. Burnley*,
   896 F.2d 985 (6th Cir. 1989) .........................................................58

*Hodges v. Abraham*,
   300 F.3d 432 (4th Cir. 2002) .........................................................26

*McMahan v. International Ass'n of Bridge, Structural & Ornamental Iron
   Workers*, 964 F.2d 1462 (4th Cir. 1992) ......................................29

*Monroe County Conservation Council, Inc. v. Volpe*,
   472 F.2d 693 (2d Cir. 1972) ...................................................55, 57

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) .........................................................49

*Muth v. United States*,
   1 F.3d 246 (4th Cir. 1993) .............................................................57

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007)........................................................................42

*Nat'l Audubon Soc'y v. Dep't of the Navy*,
   422 F.3d 174 (4th Cir. 2005) .......................................................3, 4

iv

*North Idaho Cmty. Action Network v. USDOT*,
    545 F.3d 1147 (9th Cir. 2008) .................................................................57, 59

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ............................................................4, 26, 51

*Prairie Band Pottawatmie Nation v. FHWA*,
    684 F.3d 1002 (10th Cir. 2012) ..................................................................51

*San Antonio Conservation Soc'y v. Tex. Highway Dep't*,
    446 F.2d 1013 (5th Cir. 1971) ...............................................................57, 59

*Save Barton Creek Ass'n v. FHWA*,
    950 F.2d 1129 (5th Cir. 1992) ...............................................................31, 33

*Sensible Traffic Alts. & Res., Ltd. v. Federal Transit Admin.*,
    307 F. Supp. 2d 1149 (D. Haw. 2004)........................................................31

*Sierra Club v. Dep't of Transp.*,
    948 F.2d 568 (9th Cir. 1991) .......................................................................40

*State of N.C. v. City of Virginia Beach*,
    951 F.2d 596 (4th Cir. 1991) .......................................................................37

*Webster v. United States Dep't of Agric.*,
    685 F.3d 411 (4th Cir. 2012).................................................26, 27, 31, 50

**STATUTES:**

Administrative Procedure Act

    5 U.S.C. § 706...........................................................................................42

    5 U.S.C. § 706(2)(A) .................................................................................26

Department of Transportation Act

    Section 4(f), Pub. L. No. 89-670 § 4(f), 80 Stat. 931 (1966),
    codified at 49 U.S.C. § 303 ...............................................................*passim*

49 U.S.C. § 303(c) ....................................................................39, 44

49 U.S.C. § 303(c)(2) ........................................................................51

National Environmental Policy Act

42 U.S.C. §§ 4321, *et seq* ..............................................................3

42 U.S.C. § 4332(2)(C) ....................................................................3

23 U.S.C. § 138 ..................................................................................4

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

**FEDERAL RULES AND REGULATIONS:**

23 C.F.R. § 771.111(f) ................................................................32, 34

23 C.F.R. § 771.111(f)(2) ................................................................36

23 C.F.R. § 771.111(f)(3) ................................................................37

23 C.F.R. § 771.127 ..........................................................................18

23 C.F.R. pt 774 ................................................................................4

23 C.F.R. § 774.3(a)(1) ....................................................................44

23 C.F.R. § 774.3(a)(2) ....................................................................40

23 C.F.R. § 774.3(c)(1) ................................................................51, 56

23 C.F.R. § 774.3(c)(2) ....................................................................51

23 C.F.R. § 774.11(i) ................................................................5, 40, 41

23 C.F.R. § 774.17 ....................................................39, 44, 50, 52

40 C.F.R. § 1501.4 ........................................................................................4

40 C.F.R. § 1502.1 ........................................................................................3

40 C.F.R. § 1502.14 ......................................................................................3

40 C.F.R. § 1508.9 ........................................................................................4

40 C.F.R. § 1508.25(a) ...........................................................................30, 31

40 C.F.R. § 1508.25(a)(1) ...........................................................................27

Fed. R. App. 4(a)(1)(B) ...............................................................................1

**STATE STATUTE:**

NCGS § 1136-89.197 ..................................................................................48

**OTHER:**

Exec. Order No. 7864, 3 Fed. Reg. 863 (April 12, 1938)..........................42

# GLOSSARY

| | |
|---|---|
| the agencies | Federal Highway Administration and North Carolina Department of Transportation |
| AR | Administrative Record filed in district court with page numbers |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FHWA | Federal Highway Administration |
| GARVEE | Grant Anticipation Revenue Vehicles |
| JA | Joint Appendix |
| National Seashore | Cape Hatteras National Seashore |
| NCDOT | North Carolina Department of Transportation |
| NEPA | National Environmental Policy Act |
| Plaintiffs | Defenders of Wildlife and the National Wildlife Refuge Association |
| Refuge | Pea Island National Wildlife Refuge |
| Section 4(f) | Section 4(f) of the Department of Transportation Act |

## JURISDICTIONAL STATEMENT

Plaintiffs Defenders of Wildlife and National Wildlife Refuge Association's claims against the federal and state agencies and officials present a federal question under 28 U.S.C. § 1331.  JA___ (DE 1, complaint).[1]  This Court has jurisdiction over plaintiffs' appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.  Plaintiffs filed a timely notice of appeal on October 1, 2013, from the final judgment of the district court entered on September 16, 2013.  JA___ (DE 101, notice of appeal); Fed. R. App. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

The Herbert C. Bonner Bridge in the Outer Banks of North Carolina is structurally deficient and approaching the end of its reasonable service life.  The North Carolina Department of Transportation (NCDOT) and the Federal Highway Administration (FHWA) studied and analyzed multiple options both for replacing the bridge and for maintaining or replacing the highway south of the bridge.  NCDOT and FHWA ultimately decided to build a replacement bridge alongside the current bridge and to continue to study and plan for a decision on the highway south of the bridge.  The appeal presents the following issues:

1.      Whether NCDOT and FHWA violated the prohibition on segmenting

---

[1] Citations are to pages of the parties' deferred joint appendix (JA), with cross-references to district court docket entries (DE) or the agencies' administrative record (AR, followed by page number).

1

National Environmental Policy Act (NEPA) analysis when the agencies analyzed the environmental impacts of both replacing the bridge and maintaining the highway, and then chose to proceed first with replacing the bridge and to continue planning for the highway.

2.      Whether FHWA violated Section 4(f) of the Transportation Act when it:

a.      concluded that building a 17.5-mile bridge, at a likely cost of more than a billion dollars, was not a prudent alternative to replacing the 2.4-mile bridge alongside its current location,

b.      ensured that the selected plan would minimize harm to the wildlife refuge south of the bridge and would cause the least overall harm, and

c.      employed all possible planning to minimize harm.

### STATEMENT OF THE CASE AND FACTS

**A.      Overview**

Plaintiffs Defenders of Wildlife and the National Wildlife Refuge Association challenged a decision to replace the Herbert C. Bonner Bridge in Dare County, North Carolina, and to adopt the North Carolina Highway 12 Transportation Management Plan to guide decision-making for later phases of highway construction.  Plaintiffs alleged that defendants NCDOT and FHWA violated the National Environmental Policy Act (NEPA) and that FHWA violated Section 4(f) of the Department of Transportation Act.  Both sides moved for

2

summary judgment.  The district court granted summary judgment to the defendant

agencies, rejecting all of plaintiffs' claims.  JA ___ (DE 99).  Plaintiffs have

appealed.

## B.    Statutory Background

### 1.    The National Environmental Policy Act

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*,

requires federal agencies to prepare a detailed statement on the environmental

impacts of any "major Federal action[] significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C).  The resulting Environmental

Impact Statement, or EIS, has to describe "any adverse environmental effects

which cannot be avoided," *id.*, and "[r]igorously explore and objectively evaluate"

alternatives that would minimize the adverse impacts or improve the environment.

40 C.F.R. § 1502.14; *see also id.* § 1502.1.  The EIS requirement has two aims:

(1) "ensur[ing] that a federal agency will carefully consider the effects of its

actions on the environment," and (2) "ensur[ing] that the public and government

agencies will be able to analyze and comment on the action's environmental

implications."  *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 184 (4th

Cir. 2005).  In order to decide whether an EIS is necessary, an agency may prepare

an environmental assessment, or EA, to evaluate the potential impacts of a federal

action.  40 C.F.R. §§ 1501.4, 1508.9; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009).

NEPA does not dictate substantive results, but it does require agencies to take a "hard look" at potential environmental consequences and make information available so that the public can play a role in the decision-making process.  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004).  Once a reviewing court is assured that the agency has taken the requisite "hard look" at the environmental impacts of the proposed action, the court should defer to the agency's decision. *Nat'l Audubon Soc'y*, 422 F.3d at 185.  "[A] court reviewing an EIS for NEPA compliance must take a holistic view of what the agency has done to assess environmental impact.  Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor."  *Id.* at 186.

## 2.    Section 4(f) of the Department of Transportation Act

In relevant part, Section 4(f) of the Department of Transportation Act prohibits federal funding of a transportation project requiring the use of land from a publicly owned refuge or national historic site of national, state, or local significance unless (1) there is no feasible and prudent alternative to using such land, and (2) the project includes all possible planning to minimize harm to such land resulting from the use.  Pub. L. No. 89-670, § 4(f), 80 Stat. 931, 934 (1966), currently codified at 49 U.S.C. § 303; *see also* 23 U.S.C. § 138; 23 C.F.R. pt. 774.

4

Section 4(f) does not apply to an otherwise protected property "[w]hen a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs."  23 C.F.R. § 774.11(i).  This is called the joint planning provision.

## C.    Factual Background

### 1.    The Bonner Bridge and Highway 12

The Bonner Bridge is located in the Outer Banks of North Carolina.  It is part of North Carolina Highway 12.  The bridge connects two Outer Banks islands, Bodie Island to the north and Hatteras Island to the south.  The two islands are separated by Oregon Inlet, a navigational passage between the Atlantic Ocean and the Pamlico Sound.  The bridge provides the only road access to Hatteras Island.  AR091956, 091957 (map).

In the years leading up to the opening of Bonner Bridge in 1963, the Outer Banks underwent significant transformation.  AR058331, 075565-66, 083479-80.  In the early twentieth century, Hatteras Island was comprised of relatively isolated coastal villages, accessible only by ferry and containing a small population of about 1,600 people "whose livelihoods were still tied to the sea."  AR000106, 035837, 041533, 075565-66.  The area began to change in the late 1930s, when the

5

United States took title to large swaths of Hatteras Island (excluding the villages) and converted thousands of acres to the Pea Island National Wildlife Refuge and Cape Hatteras National Seashore. AR041532-34, 075565-66. The Refuge is located south of the bridge, on the northern end of Hatteras Island. It covers nearly the entire northern end of Hatteras Island, from the northern tip of the island to the village of Rodanthe. AR058499-501. Most of the coastline north and south of the bridge is part of the National Seashore. AR091957.

During the same fifteen years (1938-1953) that witnessed the establishment of the Refuge and National Seashore, the paved precursor to Highway 12 was completed, replacing the unpaved road through what became the Refuge and National Seashore. A paved road was built from the southern tip of Hatteras Island to its northern point at Oregon Inlet. AR041650, 075565-69; *see also infra* at 42-43 (describing history of roads along Hatteras Island).

As the federal properties took shape and a modern road was developed, people flocked to the Outer Banks. AR041650-51. From 1950 to 1961, annual visitor numbers to the national seashore swelled from 41,000 to 576,000. AR001880. The number of cars using the public ferry service across Oregon Inlet jumped in the same decade from a yearly total of 8,900 to almost 150,000 automobiles. AR001880. The "fast-growing volume of visitors quickly overran the existing state ferry operation." AR041651. The situation "became so bad that

6

a bridge was the only solution." AR041652. With financial support from the United States Department of the Interior, North Carolina proceeded with construction of Bonner Bridge. It opened to traffic in November 1963. AR001931, 041712, 058331, 083480.

Bonner Bridge is referred to as the "lifeline" of Hatteras Island. AR012277, 083765, 084609, 084958, 085622-29, 092020, 092034. The bridge is 2.4 miles long and has two lanes. AR058334. For nearly 4,000 permanent residents and throngs of visitors, this bridge provides the only road access to the island. AR058327. Average daily traffic for the bridge is about 5,400 vehicles per day, or 1.9 million vehicles per year (based on 2002 figures). AR058328. Demand is highest in the summer season, when average volume for peak days reaches 10,900 vehicles. AR058328-29.

The bridge serves important functions: it provides access to mainland goods and services; it carries telephone and electrical utilities to the island; it allows for the removal of solid waste to off-island sites; it provides access to hospitals and other medical care; and it supports the tourism industry, generating jobs and revenue for Dare County and the State. AR058327-28. Bonner Bridge also serves as the hurricane evacuation route for both Hatteras and Ocracoke Islands. AR058343-45.

7

For at least two decades, the deterioration of Bonner Bridge has been a significant concern. A 1990 inspection rated the bridge condition as "poor," noting that the "overall condition of this bridge appears to be deteriorating at an unusually rapid rate." AR007519, 007521. In 1993, NCDOT reported that the bridge was "nearing the end of its service life" with a sufficiency rating of 32.5 out of 100. AR012551. The problems included "extensive corrosion of the reinforcing steel and major spalling [i.e., breaking into pieces] of concrete on the supporting structures," as well as the erosion of sand around the piles that support the substructure. AR012547. In 2002, NCDOT noted that "[a] lot of maintenance work has been done to the structure" and "[t]here is a sense of urgency and a new bridge in 2010 is pushing the limits." AR021006. By 2004, inspectors rated the condition of the bridge as "poor," gave the bridge a sufficiency rating of 6 out of 100, classified it as "structurally deficient," and indicated "a need for ongoing maintenance and rehabilitation." AR031685. By 2006, the rating had dropped further to 2 out of 100. AR058325.

NCDOT has managed to extend the bridge's remaining practical service life through rehabilitation projects, but long-term rehabilitation into an indefinite future has never been considered a viable option. AR058325, 058351 ("Bonner Bridge cannot remain in place indefinitely"), 058840 ("long-term rehabilitation is not possible"). Plaintiffs and other conservation groups have "recognize[d] the

8

pressing need to replace Bonner Bridge." AR092023, 092030. In short, there is no dispute in this appeal about the need to replace the bridge. Advances in construction technology will allow construction of a replacement bridge on deeper piles, with multiple navigation spans and with greater resilience against vessel collisions, significantly improving various shortcomings of the existing Bonner Bridge. AR058331-32, 058449-54.

The bridge is not the only transportation challenge in the area. South of the bridge on Hatteras Island, Highway 12 passes through the Refuge and National Seashore, in a dynamic barrier island environment. Sections of the highway are regularly damaged by shoreline erosion and overwash, frequently due to large storms. AR058329, 091957-58. Over the years, NCDOT has had to repeatedly repair damage to the highway in order to maintain the connection between Hatteras Island and Bodie Island and thus to maintain Hatteras Island's connection to the mainland. AR058329, 058346.

## 2. Environmental Analysis and Planning for Bridge Replacement

### a. Initial Planning in the 1990s

NCDOT and FHWA began planning for replacing the bridge and analyzing environmental impacts in the early 1990s. *See, e.g.,* AR008888 (1991 Feasibility Study explaining that "Bonner Bridge is nearing the end of its service life" and "need for a crossing of the Oregon Inlet will continue past the end of the service

life of the existing bridge"). Because the process has been so involved – resulting in FHWA and NCDOT jointly preparing more than 3,000 pages of environmental documentation – we can only summarize the process and analysis here.[2] A fuller description of the process is set forth in the administrative record. AR075558-61, 091958-60.

When NCDOT and FHWA prepared the initial draft EIS in 1993, the agencies analyzed only options for replacing the aging bridge. AR012531. The agencies considered various alternatives for crossing the inlet, including a ferry system, a tunnel, and bridging options. AR012533-36; AR008981-9005. A

---

[2] NCDOT and FHWA prepared the following:

- Draft Environmental Impact Statement and Draft Section 4(f) Evaluation in 1993 (excerpts at JA ___, full document at AR012522-954)

- Supplemental Draft Environmental Impact Statement and Draft Section 4(f) Evaluation in 2005 (excerpts at JA ___, full document at AR031649-2197)

- Supplement to the Supplemental Draft Environmental Impact Statement and Draft Section 4(f) Evaluation in 2007, (excerpts at JA ___, full document at AR038890-9072)

- Final Environmental Impact Statement and Section 4(f) Evaluation in 2008 (excerpts at JA ___, full document at AR058273-9571)

- Revised Final Section 4(f) Evaluation in 2009 (excerpts at JA ___, full document at AR075556-5734)

- Environmental Assessment in 2010, (excerpts at JA ___, full document at AR083394-913)

10

"parallel" bridge option emerged as the preferred alternative – that is, a replacement bridge next to the existing Bonner Bridge.  AR012531-36, 012557-67. Although a preliminary final EIS was prepared, it was not formally completed. AR058876.

### b.     Drafts and Final EIS, 2001-2008

In 2001, NCDOT and FHWA decided to update the 1993 draft EIS and started work on a supplemental draft EIS.  AR058878, 091958.  The agencies decided to channel project decision-making through a federal-state interagency process known as the NEPA and Clean Water Act Section 404 Merger Process. AR058878; *see generally* AR062923-33.  The purpose of the merger process is to integrate the goals of NEPA and the Clean Water Act and to build consensus as a project is developed.  AR058879, 083419.  Here, the multi-agency "Merger Team" included, in addition to NCDOT and FHWA, the United States Army Corps of Engineers, the United States Environmental Protection Agency (EPA), the United States Fish & Wildlife Service, the National Marine Fisheries Service, the National Park Service, the North Carolina Department of Environment and Natural Resources, and the North Carolina Department of Cultural Resources.  AR058878, 083419.

The Merger Team decided to expand the scope of the study to encompass Highway 12 from Bodie Island to Rodanthe.  AR021007, 021012, 058879,

11

091958.  By expanding the study all the way south to Rodanthe, NCDOT and FHWA, with input from the other team members, could explore options for both replacing the aging Bonner Bridge and alleviating the risks to Highway 12 from shoreline erosion and overwash, which had become particularly noticeable in several sections of the refuge known as the "hot spots."  *Id.*; *see also* AR059434-35; AR091958-62.

From 2002 to 2005, NCDOT and FHWA worked on the supplemental draft EIS, while coordinating with the Merger Team.  FHWA and NCDOT published the supplemental draft EIS in 2005.  JA ___ (excerpts, full document at AR031649-2197).  The supplemental draft EIS assessed two potential corridors.  One was the Parallel Bridge Corridor, which envisioned replacing the bridge at the same site and then having Highway 12 proceed on Hatteras Island as it currently does.  AR031651-54, 31795-816.  The supplemental draft EIS considered three parallel bridge alternatives for dealing with the "hot spots" – beach nourishment, road relocation, and moving the road onto structures within the Refuge.  *Id.*

The second corridor considered was the Pamlico Sound Bridge Corridor, which envisioned a bridge "approximately 17.5 miles (28.2 kilometers) in length," ranking among the longest bridges in the world.  AR031784-95, 058432, 058428-29 (map).  The bridge would cross Oregon Inlet and run through Pamlico Sound, relocating Highway 12 to the bridge.  *Id.*  It would be located up to five miles west

12

of Hatteras Island to avoid the environmentally-sensitive shallow areas with submerged aquatic vegetation. *Id.* The bridge through the Sound would bypass the three "hot spots" on Hatteras Island. AR031785. It would also avoid Refuge lands, and the natural movement of the shoreline could occur without impacting Highway 12 on the bridge. AR031948-57, 058839. The draft supplemental EIS analyzed two Pamlico Sound Bridge alternatives; the main difference between the two was the design of the bridge terminus in Rodanthe. AR031784-95, 058349, 058431.

After the agencies released the supplemental draft EIS, they held two public hearings and solicited comments on the document. AR091958-60. Based on a proposal made during the supplemental draft EIS comment period, the agencies developed two additional Parallel Bridge Corridor alternatives. AR091960. The two additional alternatives considered the possibility of different construction phases. Specifically, the alternatives considered replacing Bonner Bridge first and then proceeding in phases – accompanied by additional monitoring – to address the problems on Highway 12. NCDOT and FHWA analyzed these additional alternatives in the supplement to the supplemental draft EIS, which was released in February 2007. AR038890-97, 038925-48. Two public hearings on the supplement to the supplemental draft EIS were held. AR091960.

13

NCDOT and FHWA continued their work to finalize the EIS, working with Merger Team. In August 2007, the Merger Dispute Resolution Board (consisting of NCDOT, FHWA, the United States Army Corps of Engineers, and the North Carolina Department of Environment and Natural Resources) agreed that the Phased Approach/Rodanthe Bridge Alternative was the "Least Environmentally Damaging Practicable Alternative," which is the alternative required by Section 404 of the Clean Water Act, 33 U.S.C. § 1344. AR058279, 058838, 059444-46, 091962-65. No Merger Team member objected to the Merger Board's decision. AR083460.

On September 17, 2008, FHWA signed the final EIS and final Section 4(f) Evaluation. JA ___ (excerpts from AR058273-9571). The final EIS addressed the comments received on both the supplemental draft EIS and the supplement to the supplemental draft EIS. *See, e.g.,* AR058905-13 (excerpt). The final EIS fully considered and analyzed five Parallel Bridge Corridor alternatives and two Pamlico Sound Corridor alternatives. AR058273-303 (summary), 058428-91. The final EIS analyzed the potential environmental impacts of both replacing Bonner Bridge and maintaining Highway 12. *See, e.g.,* AR058282-301, 058497-98, 058546-606, 058612-14, 058661-753 . It analyzed options for Highway 12 maintenance, including all feasible methods for maintaining a road in a dynamic barrier island environment. AR058443-48. Those methods included beach

14

nourishment, bridging, road relocation, or some combination of the three. AR058443 (outlining five separate alternatives for "NC 12 maintenance component"). NCDOT and FHWA explained that "[a]lthough the NC [Highway] 12 Maintenance alternatives are described and addressed in this [final] EIS as five separate alternatives, their components could be mixed and matched geographically along the length of NC [Highway] 12 to create other variations." AR058443. "As such, the assessment of the five NC [Highway] 12 maintenance alternatives is representative of all possible combinations of their components." AR058443. The final EIS identified the Parallel Bridge Corridor with Phased Approach/Rodanthe Bridge as the "Preferred Alternative." AR091960. That alternative provided for immediate replacement of the Bonner Bridge in Phase I, followed by additional phases to address the problems along Highway 12.

### c.    Revising the Preferred Alternative – the EA and the Revised Section 4(f) Evaluation, 2008-2010

NCDOT and FHWA distributed the final EIS widely and received a broad range of comments from federal and state agencies and the public, including the plaintiffs here. AR069020-21. NCDOT and FHWA used the Merger Team process to address the comments and concerns they received about the final EIS and final Section 4(f) evaluation. AR063818-62. The EPA representative on the Merger Team suggested a new alternative that would combine Phase I of the Phased Approach (the replacement for Bonner Bridge) with an adaptive

15

management and joint planning process for decision-making in the southern

portion of the project area.  AR070182-84, 070191-92.  NCDOT and FHWA

proceeded to analyze this suggested alternative.[3]

In 2009, FHWA prepared a Revised Section 4(f) Evaluation to re-examine

several determinations in the prior Section 4(f) analysis, evaluate the new Preferred

Alternative that had evolved at the Merger Team meetings, analyze the feasibility

of the Pamlico Sound Bridge Corridor alternatives, and reconsider the least overall

harm determination in light of the new Preferred Alternative.  AR075556-90.

Subsequent to the 2008 Section 4(f) analysis, FHWA and NCDOT had collected

more information regarding the history of vehicular transportation across Bodie

and Hatteras Islands, and the development of the National Seashore and Refuge.

AR075564-69.  This information showed that a public vehicular thoroughfare

existed before the Refuge and Seashore were established; thus, the road, Seashore,

and Refuge were concurrently and jointly planned and developed.  AR075567,

075569.  Although this new information changed some aspects of the Section 4(f)

analysis, FHWA was still required to determine whether there was a feasible and

---

[3] Plaintiffs mischaracterize the record when they claim that the agencies
"abandoned" the "Phased Approach" in 2009 because of "numerous difficulties."
Pls. Br. 13.  The record instead shows that the agencies, based on comments on the
final EIS, continued to study a phased approach and revised the plans for that
approach (AR069080), ultimately resulting in the alternative described in the EA
and selected in the ROD that is described below.

prudent avoidance alternative, conduct all possible planning to minimize harm, and identify the alternative that would cause the least overall harm.

The Revised Section 4(f) Evaluation examined the effect of the new "Parallel Bridge Corridor with NC [Highway] 12 Transportation Management Plan" alternative, and concluded that the Pamlico Sound Bridge Corridor alternative – a long bridge totaling 17.5 miles – was not a prudent alternative because of its cost and the funding needed to construct a bridge of that magnitude in a single construction phase. AR075574-76, 075698-714. A Pamlico Sound Bridge would also present difficult maintenance problems for NCDOT state-wide because the project would consume such a large portion of the State's transportation budget. AR075711-12. Additionally, the Revised Section 4(f) analysis concluded that the Pamlico Sound Corridor alternative would adversely impact the public's access to the Refuge. AR075576, 075712-14.

On May 7, 2010, NCDOT and FHWA issued an Environmental Assessment (EA). JA ____ (excerpts from AR083394-913). The agencies prepared the EA to identify and assess changes that occurred since the completion of the final EIS that were made in response to the comments received. AR091960. The EA discussed new information obtained since the publication of the final EIS. AR083407-08. It refined the detailed study alternatives as well. AR083409-20. It explained the elimination of the Pamlico Sound Bridge Corridor alternatives as detailed study

17

alternatives.  AR083418-20.  The EA included a new detailed study alternative

based on EPA's suggestion – the Parallel Bridge Corridor with Highway 12

Transportation Management Plan alternative – explained that this alternative was

now the "Preferred Alternative," and assessed the impacts of this alternative.

AR083420-44.

Following the publication of the EA, two additional public hearings were

held in July 2010.  AR091960.  After reviewing the comments received at the

public hearings regarding the final EIS and EA, FHWA determined that the

changes identified in the EA did not result in any new significant impacts that were

not previously identified in the earlier environmental documents, and, thus, a

supplemental EIS was not required.  AR091960.

### d.    The Record of Decision, 2010

On December 20, 2010, FHWA signed the Record of Decision (ROD)

approving the "Parallel Bridge Corridor with NC [Highway] 12 Transportation

Management Plan" alternative for implementation.  AR091952-2117.  The ROD

authorizes NCDOT to begin the final engineering design for a two-lane, adjacent

replacement bridge over Oregon Inlet that will be built with 80 percent federal

highway funds administered by FHWA.  *See* AR091986; 23 C.F.R. § 771.127.

The ROD summarizes FHWA's compliance with NEPA and related federal laws.

It describes the environmental issues that were encountered; the numerous bridge,

18

ferry, and no-action alternatives that were considered; the coordination undertaken

with the public and federal, State, and local agencies; and mitigation measures that

NCDOT will be required to implement in order to receive federal funds.

AR091952-2117.  The ROD also included FHWA's responses to comments

submitted on the EA.  AR092042-99.

In addition to authorizing the replacement of the Bonner Bridge within a

parallel corridor, referred to as "Phase I," the ROD explained that additional

federally-funded Highway 12 repairs will be necessary on Hatteras Island in the

future due to shoreline erosion and storms.  AR091967, 091970, 091983.  As the

ROD explained, the final EIS and EA forecasted and analyzed future shoreline

conditions along NC 12 through the year 2060.  AR091956.  The ROD explained

that FHWA decided not to approve any particular action beyond the limits of Phase

I because of the inherent uncertainty in predicting future conditions within a

dynamic coastal barrier island environment.  AR091967.  Instead, FHWA

approved a detailed plan that requires NCDOT to monitor, study, and conduct

additional agency and public coordination before coming back to FHWA for

approval to implement each future phase of Highway 12 repair, which is called the

"NC 12 Transportation Management Plan."  AR091959 (map depicting Phase I

and Highway 12 Transportation Management Plan); AR091967-70.  The ROD

stated that "FHWA and NCDOT also will complete the appropriate NEPA

19

documentation for each future phase of action," AR091970; "the study and

selection of each future phase will be carried through the NEPA/Section 404

Merger Process," AR091983; and "FHWA will not approve a future phase of the

project for construction until all necessary permits have been obtained for that

particular phase," AR091985.[4]

The ROD and the Final and Revised Final Section 4(f) Evaluations

explained why NCDOT and FHWA were ruling out the Pamlico Sound Corridor,

drawing on the discussion of the Pamlico Sound Corridor alternatives discussed in

the final EIS and ruled out for further analysis in the EA.  AR075700-14, 091961-

65.  Building a 17-mile bridge through the Sound would be prohibitively

expensive, with serious ripple effects on NCDOT's budget.  *Id.*  The Pamlico

Sound Corridor's estimated 50-year cost (including construction, operation, and

maintenance) ranged from $1.299 billion to $1.797 billion.  AR 058479-81.  And,

unlike the phased approval that the agencies chose, most of that money would be

needed upfront to pay for initial construction.  AR058480-81, 058838, 075700.

The 2008 Final Section 4(f) Evaluation explained that "[t]he Pamlico Sound

---

[4] Plaintiffs incorrectly claim that members of the Merger Team "reject[ed]" the
varied possibilities for maintaining Highway 12.  Pls. Br. 12.  While the Merger
Team members, including federal agencies, expressed their concerns about impacts
on the Refuge (*see, e.g.,* AR034434-50; AR068825-28; AR083740-42), the
comments cited by plaintiffs all pre-date the EA and the ROD.  The Merger Team
agencies did not "reject" NCDOT's and FHWA's choice of the preferred
alternative in the EA, which the agencies then chose to implement in the ROD.
*See, e.g.,* AR092001-02, 092006-07, 092012.

20

Bridge Corridor alternatives cannot be built in operational phases and are,
therefore, not practicable because of the lack of funding for construction."
AR058840. And the poor condition of the Bonner Bridge made it impossible to
wait: "Since the current Bonner Bridge has a sufficiency rating of 2 (on a scale of 2
to 100), and long-term rehabilitation of the bridge is not possible, the timely
replacement of the bridge is of immediate concern." AR058840. The 2009
Revised Final Section 4(f) Evaluation further explained that "implementation of
any of the Pamlico Sound Bridge Corridor alternatives would require a single
construction phase costing between $942.9 million and $1.441 billion (2006
dollars)." AR075575. Phasing "of a single, 17.5-mile long bridge" was not
possible. AR075575-76. "Funding a 17.5-mile bridge would create a unique
maintenance problem of extraordinary magnitude for NCDOT as it would have to
defer much needed improvements on the remainder of the State highway system in
North Carolina for a significant period of time." AR075576. And "[t]he Pamlico
Sound Bridge Corridor would also have severe adverse impacts to the public's
access to the Refuge." AR075576; *see also* AR075701 (Merger Team did not
object to this analysis).

## D.    The District Court Proceedings

Plaintiffs filed their complaint in July 2011. JA ___ (DE 1). NCDOT and
FHWA filed a voluminous administrative record, totaling more than 92,000 pages,

and reflecting the nearly 20 years of planning that led to the Record of Decision. Both sides moved for summary judgment.

The district court granted summary judgment for the agencies, rejecting all of plaintiffs' NEPA and Section 4(f) arguments.  JA ___ (DE 99).  As to the arguments that plaintiffs continue to press on appeal, the court held that NCDOT and FHWA did not impermissibly segment their NEPA analysis.  JA ___ (Order at 17-24).  The court explained that replacing the bridge has logical termini and independent utility and does not impermissibly restrict the options available for future phases of the project.  *Id.*

As to Section 4(f), the court held that the Pamlico Sound Corridor bridge was not a prudent alternative because "FHWA was unable to find a way to pay for this alternative" and "[t]he commitment of state and federal resources to the Pamlico Sound Bridge Corridor alternative could deprive the State of the ability to replace other deficient bridges and advance other needed construction projects for two to seven years, depending on the source of funding."  JA ___ (Order at 38). The court found that FHWA had employed "all possible planning" to minimize harm to the Refuge, as required by Section 4(f).  JA ___ (Order at 39).  The court rejected plaintiffs' contention that FHWA arbitrarily applied the joint planning provision, holding that "a public vehicular thoroughfare existed through the land that later became the Seashore and Refuge, and that the road was concurrently and

22

jointly planned and developed with the establishment of the Seashore and Refuge."
JA ___ (Order at 35-36).

## SUMMARY OF ARGUMENT

**I. NEPA.** The agencies did not improperly segment their NEPA review. Segmentation analysis focuses on whether an agency is attempting to avoid the requirement to prepare an EIS or otherwise limit their environmental analysis by breaking up what should be considered a single project into smaller projects. Here, however, NCDOT and FHWA analyzed the entire project – both replacing the bridge and options for Highway 12 – in the final EIS and the EA. NCDOT and FHWA conducted a full end-to-end study of alternatives and associated impacts for the entire length of the project, from the northern limit on Bodie Island to the southern limit in the village of Rodanthe. The agencies fully considered and analyzed the possibility of building the 17.5-mile bridge through Pamlico Sound as well. The agencies' NEPA analysis was not segmented in any way.

Plaintiffs claim that the agencies violated NEPA when the Record of Decision – the ROD – announced the decision to move forward in phases. But nothing in NEPA requires an agency to authorize all phases of a proposed action evaluated in an EIS at the time it issues a ROD. Plaintiffs have no support for their claim that limiting a ROD violates NEPA's segmentation rules where the agencies have fully analyzed the entire project in an EIS and EA.

23

Even assuming that the anti-segmentation principle applies to the ROD, the ROD does not violate NEPA. Replacing the failing bridge is consistent with FHWA regulations addressing segmentation in the context of highway funding (which focus on the scope of the EIS and/or EA, not the scope of the ROD). First, the replacement bridge has logical termini because it will replace a structurally-deficient bridge that spans a major inlet and that connects two islands. Second, the replacement bridge has independent utility because it will replace the structurally-deficient bridge that is currently in place and it will provide for a way to cross Oregon Inlet. Third, the replacement bridge does not restrict the consideration of alternatives. The selected approach provides for further study of options for Highway 12 and it provides for further NEPA review before the agencies ever choose amongst those alternatives. And the decision not to proceed with the 17.5-mile bridge through Pamlico Sound was made only after a complete evaluation of that possibility.

**II. Section 4(f).** FHWA complied with its Section 4(f) obligations. As an initial matter, FHWA did not err in its joint planning determination here. Because the Refuge is also a historic site, FHWA treated the Refuge as a Section 4(f) property – that is, it did not apply the joint planning provision to avoid Section 4(f) analysis. Rather, FHWA fully analyzed the issues of feasible and prudent alternatives to using the Refuge and the minimization of harm to the Refuge in its

24

Section 4(f) analysis.  In any event, FHWA did not err in the limited way in which it did apply the joint planning provision – that is, in concluding that the Refuge triggers Section 4(f) because of its historic status but does not trigger Section 4(f) because of its status as a refuge.  The historical record establishes that a public vehicular thoroughfare existed through the land that became the Refuge and that the road was concurrently and jointly planned and developed with the Refuge.

FHWA did not arbitrarily reject the Pamlico Sound Corridor alternatives as too costly and thus "not prudent."  The 17.5-mile Pamlico Sound Corridor alternative would be the second longest bridge in the United States and the most expensive single structure contract ever awarded in the country.  It would cost between $942.9 million and $1.441 billion in 2006 dollars.  It would consume a large portion of the State's transportation budget, preventing the State from maintaining its other roads and bridges.

FHWA complied with the Section 4(f) "all possible planning" and "least overall harm" requirements.  When an agency has finished its inquiry into "feasible and prudent" alternatives to using Section 4(f) property, the agency must select, from among the remaining alternatives that do result in a "use," the alternative that causes the "least overall harm in light of the statute's preservation purpose" and must employ "all possible planning to minimize harm."  FHWA did so here.  It adopted all reasonable measures to minimize or mitigate harm from replacing the

25

bridge. As with its NEPA analysis, it planned for and adopted mitigation to eliminate harm not just for the immediate bridge area, but for the entire project area. And FHWA committed to additional Section 4(f) review – and NEPA review – before giving further federal approval to actions in the Highway 12 corridor.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's findings on an administrative record." *Ohio Valley*, 556 F.3d at 191. Both plaintiffs' NEPA and Section 4(f) claims are reviewed pursuant to the Administrative Procedure Act, which provides that agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also, e.g., Webster v. United States Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012) (NEPA); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (Section 4(f)). "This involves a searching and careful, but ultimately narrow and highly deferential, inquiry. In the end, '[i]f the agency has followed the proper procedures, and if there is a rational basis for its decision, we will not disturb its judgment.'" *Webster*, 685 F.3d at 422 (quoting *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002)). The focus of judicial review is "not to determine whether the defendants made the best choice, but only whether they made a choice that was informed and reasonable." *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 963 (7th Cir. 2003).

26

## ARGUMENT

## I. THE AGENCIES DID NOT IMPROPERLY SEGMENT THEIR NEPA ANALYIS.

Segmentation analysis focuses on whether an agency is attempting to avoid the requirement to prepare an EIS or otherwise limit the environmental analysis by breaking up what should be considered a single project into smaller projects. The core NEPA segmentation requirement is that "[a]gencies must consider connected actions in the same EIS." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012); *see also* 40 C.F.R. § 1508.25(a)(1) (defining "[c]onnected actions" that should be analyzed in same EIS). "This requirement is intended to prevent agencies from engaging in segmentation, which involves 'an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project.'" *Webster*, 685 F.3d at 426 (quoting *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009)).

Below, the brief first explains the central flaw in plaintiffs' argument: the agencies here fully analyzed the environmental impacts of maintaining Highway 12 in their final EIS and EA, and the agencies' decision to move forward with part of the project – replacing only the bridge for now – does not violate segmentation doctrine (part A). In any event, replacing the failing bridge here has logical termini and independent utility and does not restrict the consideration of alternatives (part B).

27

A.    **The Agencies' NEPA Analysis Evaluated Options for the Entire Highway, Not Just Replacing the Bridge, and Thus the Analysis Is Not Improperly Segmented.**

Plaintiffs' segmentation claim fails at the threshold: because NCDOT and FHWA analyzed the entire project – both replacing the bridge and options for Highway 12 – in the final EIS and the EA, the agencies did not segment their environmental analysis. The segmentation doctrine prohibits agencies from taking shortcuts in the EIS and/or the EA by splitting up a project in order to avoid study of its overall environmental impacts. But plaintiffs do not claim that the EIS or EA were segmented or limited. They instead claim that the agencies violated NEPA when they announced in the ROD their decision to move forward in phases. Pls. Br. 18 (alleging that agencies violated NEPA "[b]y limiting the ROD"). Nothing in NEPA requires an agency to authorize all phases of a proposed action evaluated in an EIS at the time it issues a ROD. Plaintiffs have no support for their claim that limiting a ROD violates NEPA's segmentation rules where the agencies have fully analyzed the entire project in an EIS and EA.[5]

_____

[5] The district court did not reach this issue. It instead applied the segmentation factors that control the analysis of whether an agency has impermissibly limited *an EIS or EA* to the question of whether *the ROD* here was impermissibly limited or segmented. As is explained below in part B, the district court correctly concluded that, applying the segmentation factors, the ROD was not impermissibly limited. But this Court can resolve plaintiffs' NEPA arguments on the threshold issue of whether the segmentation analysis even applies to the ROD here: it does not. *See McMahan v. International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 964 F.2d 1462, 1467 (4th Cir. 1992) ("We of course have the power to

28

Plaintiffs' argument obscures the fact that NCDOT and FHWA conducted a full end-to-end study of alternatives and associated impacts for the entire length of the project, from the northern limit on Bodie Island to the southern limit in the village of Rodanthe.  The 2008 final EIS, 2010 EA, and 2010 ROD make plain that the agencies considered, analyzed, and disclosed all conceivable methods for maintaining Highway 12 in its current corridor – i.e., bridging, road relocation, and beach nourishment.  AR058443-48 (final EIS), 083409 (EA), 091961-62 (ROD).  As the agencies explained when introducing the preferred alternative in the EA, "[p]ossible solutions for later phases of the project include bridging, road relocation, and/or beach nourishment.  All of these solutions, which are available for implementation as part of the Preferred Alternative, were identified and assessed as part of the [final]EIS and would be reassessed at the time decisions on future phases are being made."  AR083436; *see also* AR092089 .[6]  Moreover, the

---

affirm a judgment for any reason appearing on the record, notwithstanding that the reason was not addressed below.").

[6] Plaintiffs incorrectly claim (p. 20) that in deciding to proceed with a limited ROD, "Defendants ignored their own earlier conclusion that '*a decision on the entire corridor through Rodanthe is needed* [for] complete NEPA studies. AR042502 (emphasis added)."  The document cited – minutes from a Merger Team Review Board meeting in 2007 – makes no such conclusion.  The full sentence follows: "Beth [a NCDOT employee] added that NCDOT and FHWA feel that a decision on the entire corridor through Rodanthe is needed complete NEPA studies."  As explained above, the agencies went on to complete full NEPA studies examining the entire corridor, and this rather unclear statement does not

agencies fully considered, analyzed, and disclosed building the 17.5-mile bridge through Pamlico Sound as well. *See, e.g.,* AR058428-42 (final EIS), AR083418-20 (EA); *supra* at 12-18.

There is no legal support for plaintiffs' position that all facets of this project must be authorized in a single ROD. The Eleventh Circuit recently rejected this very argument made by the same lead plaintiff as here in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013). There, the Navy's "final EIS fully analyzed the environmental impacts of both constructing and operating the [undersea warfare training] range." *Id.* at 1110. The Navy then proceeded to issue a ROD authorizing only the construction of the range, not its operation. *Id.* at 1115-16. The Eleventh Circuit squarely rejected the argument that NEPA's anti-segmentation principle applies to a ROD. The court explained that "Appellants have presented no authority mandating that an agency must authorize all stages of a project in one ROD. Indeed, the EIS is '[a]t the heart of NEPA,' rather than the ROD, which is merely a means of documenting the agency's final decision on a proposed action that required an EIS." *Id.* at 1116 (quoting *Public Citizen*, 541 U.S. at 757). The court further explained that "[w]hile a fundamental NEPA principle is that connected actions be analyzed together in one EIS, *see* 40 C.F.R. § 1508.25(a), Appellants have conceded that the

---

describe FHWA's decision in the ROD, which occurred more than three years later.

30

Navy's EIS analyzed both phases of the [range]." *Id.* The court concluded that "nothing in NEPA reiterates this 'anti-segmentation' principle with regard to an ROD." *Id.*; *see also Sensible Traffic Alts. & Res., Ltd. v. Federal Transit Admin.*, 307 F. Supp. 2d 1149, 1166 (D. Haw. 2004) (discussing challenge to initial segment of a multiphase transit project and concluding that decision to authorize only first segment was "reasonable" and "certainly fulfill[ed] the purposes of NEPA"). The Eleventh Circuit's decision is in accord with cases stressing that the anti-segmentation doctrine focuses on the scope of the EIS or EA. *See, e.g., Webster*, 685 F.3d at 426; *Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1139 (5th Cir. 1992).

NCDOT and FHWA's approach is also fully consistent with the Council of Environmental Quality's NEPA regulations, which provide that "[c]onnected actions . . . should be discussed *in the same impact statement*" and that "[c]umlative actions . . . should therefore be discussed *in the same impact statement*." 40 C.F.R. § 1508.25(a) (emphasis added). Here, the agencies discussed all of the impacts of the project in the final EIS and EA as required by the regulation; the regulation does not apply to the decision the agencies then made in the ROD.

Moreover, NCDOT and FHWA explained how the EIS and EA satisfied the anti-segmentation policy because they considered and analyzed options both for

31

replacing the bridge and addressing the problems on Highway 12.  AR083439-40.
The agencies explained that that "the Preferred [now Selected] Alternative is not
segmented in its scope or in its environmental impact assessment, consistent with
the 23 CFR 771.111(f) regulations."  AR083440.  In response to comments raising
segmentation concerns, the agencies stressed that they had analyzed alternatives
for the "full length" of the project.  AR092089; *see also* AR092088 (comment
noting that "[f]or at least a decade, NCDOT and FHWA have treated the Bonner
Bridge Replacement Project as including not only the construction of a new bridge
from the southern end of Bodie Island over Oregon Inlet to Hatteras Island, but
also the maintenance of a transportation corridor all the way to the mid-point of
Hatteras Island at the town of Rodanthe").  The agencies explained, however, that
they were now "at the decision point in the NEPA process."  AR092089.

    In sum, plaintiffs' segmentation claims are groundless.  Plaintiffs fail to
acknowledge that the agencies examined both bridge replacement and the
remainder of the Highway 12 corridor together in one comprehensive study.
Plaintiffs' arguments are unhinged from the purpose of the segmentation rule,
which is to ensure a sufficiently broad environmental study.  That is precisely the
kind of extensive study that was conducted in this case.  Plaintiffs' NEPA
argument should be rejected.

**B.     Even Assuming that the Anti-Segmentation Rule Applies to the ROD, the ROD Does Not Violate NEPA.**

As explained above, NCDOT and FHWA did not impermissibly segment because the EIS and EA reviewed the entire project and nothing prevents an agency from issuing a more limited ROD.  Even assuming that the segmentation doctrine applies to the ROD here, the agencies did not violate segmentation principles, as the district court concluded.  JA ___ (Order at 17-24).

"[T]he purpose of segmentation review is not for a court to decide whether or not an agency drew the correct lines when putting the boundaries on its projects."  *Highway J*, 349 F.3d at 962.  Rather, "[s]egmentation analysis functions to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist."  *Id.* (emphasis and alteration in original, quoting *Save Barton Creek*, 950 F.2d at 1139).

FHWA has promulgated regulations that address segmentation in the context of highway funding.  Like the cases discussed above, the regulations focus on the scope of the EIS and/or EA, not on the scope of the action that the agency chooses to take after preparing the EIS and/or EA.  The regulations provide that:

> In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:
>
> > (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

33

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f); *see also, e.g., Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68-70 (D.C. Cir. 1987) (applying Section 771.111(f) to assess NEPA compliance). Here, replacing the bridge satisfies the test set forth in the regulation.

### 1. The replacement bridge has logical termini.

The replacement bridge has logical termini because replacing a structurally-deficient bridge that spans a major inlet and connects two islands is "logical." The bridge will connect Highway 12 across Oregon Inlet. AR083422 (describing the termini of the Selected Alternative's parallel bridge), 083424. Such connection of state roads does not violate NEPA segmentation principles. *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1483 (10th Cir. 1990). The First Circuit has held that limiting NEPA analysis to a highway connector between two bridges, with the bridges providing the termini for the project, does not constitute improper segmentation. As here, the bridges "represent the only way that cars can get onto and off of the island. Thus, traffic passing through southern Rhode Island is controlled by the existence and condition of those bridges." *Conservation Law Found. v. FHWA*, 24 F.3d 1465, 1472 (1st Cir. 1994). The First Circuit concluded

34

that "when viewed through the lens of basic common sense, two bridges on either side of an island appear to be perfectly logical termini to us." *Id.*; *see also Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1150-51 (S.D. Fla. 2005) (finding that FHWA did not improperly segment bridge replacement project because replacing an obsolete bridge had independent utility separate from other road improvements that could be made); JA ___ (Order at 21).

Plaintiffs argue that extending the southern terminus for the bridge replacement 12.5 miles further south to Rodanthe is more logical than replacing the bridge where it is now. Pls. Br. 28. But NEPA and FHWA's regulations do not require that the action being evaluated use the "most logical" terminus, only one that is logical. *Vill. of Los Ranchos*, 906 F.2d at 1483 ("That a terminus is the most logical is not mandated by the segmentation analysis – that analysis requires only that a terminus be 'logical.'").

### 2.     The replacement bridge has independent utility.

The replacement bridge satisfies the independent utility prong of the regulation. The existing Bonner Bridge is "structurally deficient" and "vulnerable to damage from vessels because of short navigational spans." AR083440; *see* AR058325, 083472; *supra* at 8-9. "The need for a crossing of the Oregon Inlet will continue past the end of the service life of Bonner Bridge. Continued demand for convenient daily and emergency access across Oregon Inlet is expected to

35

occur." AR058777. Moreover, the replacement bridge has independent utility because it provides travelers with a means of crossing Oregon Inlet. AR083440; *cf. Conservation Law Found.*, 24 F.3d at 1472 (bridges over a "considerably large body of water" have "perfectly logical termini"). Replacing the current bridge with a parallel bridge would be "a reasonable expenditure even if no additional transportation improvements in the area are made," 23 C.F.R. § 771.111(f)(2), because the replacement bridge would use the existing Highway 12 easement. *See* AR091963 (noting that the relevant Merger Team members agreed that "every effort should be made to place the new bridge terminus within the existing easement").

In addition, replacing the bridge has independent utility under Section 771.111(f)(2) because it "is a critical expenditure to ensure public safety." AR083440. As the Seventh Circuit explained, a bridge project addressing "immediate safety concerns" can have independent utility, even where the replacement project abuts an 18-mile highway widening project. *Highway J*, 349 F.3d at 963; *see also Fla. Keys Citizens Coal.*, 374 F. Supp. 2d at 1150-51.

### 3.     The replacement bridge does not restrict the consideration of alternatives.

Replacing the bridge is consistent with the requirement that the action evaluated "[n]ot restrict consideration of alternatives for other reasonably foreseeable transportation improvements."  23 C.F.R. § 771.111(f)(3).  The bridge replacement does not violate NEPA, as it does not "limit[] the choice of reasonable alternatives available to federal decision-makers."  *State of N.C. v. City of Virginia Beach*, 951 F.2d 596, 602 (4th Cir. 1991).  Indeed, as the district court concluded, "the Bonner Bridge replacement 'contemplates, rather than restricts, future roadway projects.'"  JA ___ (Order at 24, *quoting Highway J*, 349 F.3d at 963); AR091967 (discussing future options).  The preferred alternative – replacing the bridge with further study of options for Highway 12 – will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements, but enables FHWA and NCDOT, with the concurrence of the Merger Team, to select alternatives for future phases that are appropriate in light of future conditions in the project area.

Moreover, as explained above, the decision to replace the bridge here was made only after a full study of alternatives, including the Pamlico Sound Corridor alternatives.  *See, e.g.,* AR083440 ("[A]lthough the new Preferred Alternative does not immediately prescribe preferred activities beyond Phase I, FHWA and NCDOT have evaluated and assessed environmental issues to maintain transportation along

37

the Parallel Bridge Corridor for the entire project corridor."); AR092069 ("The impacts presented for the Parallel Bridge Corridor alternatives consider the environmental consequences of the full project and reflect the reasonably foreseeable range of impacts for the various phases of the NC 12 Transportation Management Plan alternative"); AR092089-90 (stating that alternatives were evaluated across their full length from Bodie Island to Rodanthe).  The agencies rejected the Pamlico Sound Corridor alternatives as not prudent only after detailed study.  *See, e.g.,* AR083418-20 (EA), AR075575-76, 075700-14.  Rejection of the Pamlico Sound Corridor Bridge on its merits occurred *before* choosing to replace the Bonner Bridge, fully consistent with the segmentation regulation.

Finally, the agencies explained why the replacement bridge does not restrict alternatives going forward.  "[T]he proposed project also does not restrict consideration of alternatives for other reasonably foreseeable transportation improvements within the project study area, as no further improvements other than the NC 12 Transportation Management Plan Alternative are foreseen within the project study area, mainly because of the island's narrow configuration and the absence of any major cross streets along the corridor."   AR083440.  And replacing the bridge "does not restrict consideration of alternatives for foreseeable transportation improvements proposed at two hot spots on Hatteras Island near

38

Buxton and Hatteras Village, well south of the southern limit (Rodanthe) of this

project."  AR083440.

## II.    FHWA COMPLIED WITH DEPARTMENT OF TRANSPORTATION ACT SECTION 4(f).

Under Section 4(f) of the Department of Transportation Act, FHWA may

approve a project requiring the use of parklands, wildlife refuges, or historic sites

provided two conditions are met: "(1) there is no prudent and feasible alternative to

using that land; and (2) the program or project includes all possible planning to

minimize harm to the park, recreation area, wildlife and waterfowl refuge, or

historic site resulting from the use."  49 U.S.C. § 303(c).

The Supreme Court described the Section 4(f) framework in *Citizens to

Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).  Before a protected property

may be "used" by a project, FHWA first must determine that there is no feasible

and prudent alternative to using that property.  *Id.* at 411; *see also, e.g., Hickory

Neighborhood Defense League v. Skinner*, 910 F.2d 159, 162 (4th Cir. 1990);

*Coal. on Sensible Transp.*, 826 F.2d at 62.  An alternative is imprudent if it

presents "unusual factors" or extraordinary costs that counsel against building a

highway along such a route.  *Overton Park*, 401 U.S. at 413; *see also* 23 C.F.R.

§ 774.17 (defining "feasible and prudent avoidance alternative").  Second, if no

feasible and prudent alternative is available, FHWA must also find that the plans

for the project minimize the harm to the protected property.  *Overton Park*, 401

39

U.S. at 411; *see also, e.g., Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 60 (4th Cir. 1990); *Coal. on Sensible Transp.*, 826 F.2d at 62; 23 C.F.R. § 774.3(a)(2).

FHWA's Section 4(f) decision "is entitled to a presumption of regularity." *Overton Park*, 401 U.S. at 415.  Although the court must engage in a "searching and careful" inquiry, the "ultimate standard of review is a narrow one," as the "court is not empowered to substitute its judgment for that of the agency."  *Id.* at 416.  While "'the Secretary must start with a strong presumption against turning chlorophyll cloverleafs in the parks into concrete ones . . . it may be prudent to use the § 4(f) land.  If the Secretary makes that hard decision, it must be respected.'" *Hickory Neighborhood*, 910 F.2d at 163 (quoting *Eagle Found., Inc. v. Dole*, 813 F.2d 798, 804-05 (7th Cir. 1987)).

There is also a threshold issue that can either obviate the need for a Section 4(f) review or affect the required scope of a Section 4(f) review.  Section 4(f) does not apply to an otherwise protected property "[w]hen a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs."  23 C.F.R. § 774.11(i); *see also, e.g., Sierra Club v. Dep't of Transp.*, 948 F.2d 568, 574 (9th Cir. 1991) ("Section 4(f) is not meant to force

40

upon a community, wishing to establish a less than pristine park affected by a road, the choice between a pristine park and a road."). This is called the joint planning provision. Below, we first explain the limited application of the joint planning provision here (part A), before turning to the issues of feasible and prudent alternatives (part B) and the minimization of harm (part C).

### A.    FHWA Properly Analyzed the Use of Protected Properties in Its Revised Section 4(f) Evaluation.

Plaintiffs argue that FHWA erred in applying the joint planning provision. Pls. Br. 57-61. As an initial matter, it is important to understand that FHWA did not apply the joint planning provision to avoid or even limit its Section 4(f) analysis of the Refuge. Section 4(f) provides protection to parks, refuges, and historic sites. However, while the joint planning provision exempts the use of refuge property from Section 4(f) analysis, it does not apply to impacts on historic properties. 23 C.F.R. § 774.11(i). Because the Refuge is also a historic site, FHWA treated the Refuge as a Section 4(f) property and went forward with a full Section 4(f) evaluation. As FHWA explained in the ROD, "FHWA did determine that a Section 4(f) approval would be required for the 'use' of property in the Refuge" and "the evaluation includes an analysis of impacts to the Refuge." AR092066; *see also* AR075556-90. Thus, the distinction FHWA made between the Refuge (as a refuge) and the Refuge (as a historic property) ultimately did not make a difference in terms of the Section 4(f) analysis that FHWA undertook for

41

the Refuge. Plaintiffs cannot establish prejudicial error with respect to the joint planning provision. *See, e.g.*, 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007).[7]

In any event, FHWA did not err in the limited way in which it did apply the joint planning provision. As FHWA explained in the Revised Section 4(f) Evaluation, the historical record shows that a public vehicular thoroughfare existed through the land that later became the Seashore and Refuge and that the road was concurrently and jointly planned and developed with the establishment of the Seashore and Refuge. AR075564, 075567, 075631-36 (timeline summarizing history of road on northern Hatteras Island). Thus, Section 4(f) did not apply to the Seashore or Refuge *as a refuge*.

Despite it not making a difference, plaintiffs still assert that FHWA's determination that Highway 12 was planned jointly or concurrently with the Refuge is arbitrary and capricious. Pls. Br. 59-60. Plaintiffs focus on the time between the establishment of the refuge in 1938, Exec. Order No. 7864, 3 Fed. Reg. 863 (April 12, 1938), and when the federal government granted an easement

---

[7] The joint planning provision did affect FHWA's analysis of the National Seashore on Bodie Island, north of the Bonner Bridge. AR075564-67. Plaintiffs, however, have not challenged the application of the joint planning provision to the National Seashore.

to North Carolina for a right of way to maintain a road in 1954.  AR000108, 068658.

Plaintiffs overlook evidence in the record showing joint or concurrent planning when the Refuge was established in 1938, most notably a contemporaneous map depicting an unimproved road through what would become the Refuge.  AR000102, 000123, 000142, 000175-87, 078363, 083817-22.  The Executive Order establishing the Refuge reserved the lands for the Refuge "subject to valid existing rights."  AR000074.  Later in 1938 when the United States acquired the land for the Refuge through condemnation actions, the acquisitions did not include existing public highways and public utility easements across the island.  AR000078, 075568.[8]  In sum, the federal government preserved the Hatteras Island area beginning in 1938 with an understanding that vehicular passage would be accommodated.  Thus, FHWA did not arbitrarily apply the joint planning provision.

_____

[8] The road is also depicted on the United States Coast and Geodetic Survey map published in 1942, which was based upon surveys through 1938.  AR078362.  The road's existence is further supported by a 1939 public ferry permit application describing ferry service beginning in 1926, AR000104-22; photographs of the ferry carrying cars, AR000001-2; NC State Highway Maps from 1944 (AR000253) and 1949 (AR000587); and Refuge Manager reports mentioning the "public road" and/or describing work done to keep the public road passable in 1938 (AR000103), 1940 (AR000147), 1942 (AR000190), 1943 (AR000199), 1944 (AR000212), 1945 (AR000300), 1947 (AR000451, 000454), and 1949 (AR000524).  Bus service through Pea Island between Hatteras village and Manteo began in 1938.  AR085434.

**B.    The Agencies Properly Rejected the Pamlico Sound Corridor Because It Was Not a Prudent Avoidance Alternative.**

The 17.5-mile Pamlico Sound Corridor alternative "would be the second longest bridge in the United States" and "also would be the most expensive single structure contract ever awarded in the country."  AR075711.  Plaintiffs nonetheless contend that FHWA arbitrarily and capriciously dismissed the Pamlico Sound Corridor as a Section 4(f) avoidance alternative based on it being "not prudent." Plaintiffs fail to carry their burden.  The record plainly shows that the Pamlico Sound bridge would not be prudent because of its high costs and related funding issues.

Section 4(f) allows FHWA to authorize the use of park, wildlife, or historic property when there are no "feasible and prudent" alternatives that would avoid the use of such property.  49 U.S.C. § 303(c); 23 C.F.R. § 774.3(a)(1).  FHWA's regulations provide, in pertinent part, that "an alternative is not prudent if:"

> . . . (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
>
> (v) It causes other unique problems or unusual factors; or
>
> (vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

23 C.F.R. § 774.17.

44

FHWA here concluded that the alternative was "not prudent" because of the extraordinary cost of the Pamlico Sound bridge and the cascading effects of that cost. AR075698-714. FHWA's conclusion was supported by data, analysis, and expert judgment, as summarized in the Revised Final Section 4(f) Evaluation. The Pamlico Sound Corridor alternatives would cost between $942.9 million and $1.441 billion in 2006 dollars. AR075575, 075700. In contrast, the Parallel Bridge Corridor with Highway 12 Transportation Management Plan would cost only $615 million to $759 million for the least expensive option and $719.7 to $1.0 billion for the second least expensive option. AR083442-43.

Appendix G of the revised evaluation examined in detail the advisability and financial reality of trying to fund a Pamlico Sound bridge. AR075698-722. It relied on cost estimates prepared by NCDOT, corroborated by an expert third party engineering firm, verified by FHWA, and reviewed by the Merger Team. *See* AR075701. In the end, the agencies determined that the Pamlico Sound Corridor alternative could not be phased over time and "would require financing in its entirety a single construction phase costing between $942.9 million and $1.441 billion (2006 dollars)." AR083419, 075700.

FHWA examined whether the $942.9 million to $1.441 billion cost for the Pamlico Sound Corridor could be funded using the traditional sources of transportation funding: apportioned Federal-aid highway funds, advanced

45

construction cash flow management, and Grant Anticipation Revenue Vehicles

Bonds (GARVEE Bonds), which are transportation bonds issued by the State

against future federal transportation allocations.  AR075702-06.  FHWA concluded

that the cost could not be funded.  By consuming an excessive share of federal

dollars made available to North Carolina, "NCDOT would have to defer

addressing other transportation improvement and safety needs on the National

Highway System and would have to defer replacing all of its other deficient

bridges in the state using Federal highway funds for nearly two years."

AR075704.  GARVEE bonds were considered but determined not viable because

of statutory debt service limitations.[9]  AR075705-06.  For example, the debt

service on GARVEE bonds would consume about 44% to 86% of the statutory

debt service limitation in a single project and thus present a significant conflict

with the already-substantial GARVEE commitments on other projects in the State.

AR075706.  As another measure of the Pamlico alternative's extraordinary

budgetary impact, the agencies determined that its construction cost "is roughly

similar to funding programmed for bridges in the STIP [i.e., the state transportation

plan] for the next seven years, statewide."  AR075711.  Thus, funding a Pamlico

---

[9] Contrary to plaintiffs' assertions that viable legislative avenues were blithely
dismissed (p. 52), NCDOT did seek legislation that would have allowed more
flexible use of GARVEE bonds to fund highly expensive projects such as the
Pamlico Sound Corridor alternative, but such a law was never passed.  AR058490.

Sound alternative "would create a drastic burden on the state's ability to maintain the other bridges on the North Carolina State Highway System."  AR075709.

In contrast, FHWA determined that the selected alternative could be funded using traditional funding mechanisms over multiple funding cycles.  AR083441-44, 091967-71.  The agencies determined that "the total estimated cost of the Selected Alternative through 2060 (including all construction, operation and maintenance, right-of-way, Bonner Bridge demolition, and wetland mitigation costs) ranges from approximately $615 million to $1.5 billion (in 2006 dollars) and is dependent upon what options are selected for future phases of the project." AR091971.  The prudent approach is the selected alternative, which contemplates a $265-$315 million Phase I replacement in order to immediately address the problem of a structurally-deficient bridge used by millions of people annually.  The selected alternative is also prudent because it will allow the agencies to target later phases at specific problem areas, to be addressed if and when funds are available. *See* AR091971.

Plaintiffs try to show that a variety of non-traditional financing methods – such as tolls, legislative earmarks, general obligation bonds, and competitive grants – could have rendered the costs of the Pamlico Sound Corridor bearable and prudent.  Plaintiffs are incorrect.  The record shows that the agencies considered a range of non-traditional means to fund the Pamlico Sound Corridor, including the

47

State Infrastructure Bank, tolls, and a Public Private Partnership. AR058489-91, 082446-47. Each, however, was either unavailable or insufficient. *Id.*; *see also* AR082447-52.

As an example, tolling the Pamlico route was considered, but ultimately rejected, by the agencies. Not only would tolling require change in state law, *see* NCGS § 1136-89.197, FHWA also calculated "that a single-trip toll rate of approximately $18 to $31 in each direction" would be required, which would be "extremely high" especially "considering the absence of other transportation choices available for those traveling NC [Highway] 12." AR075709-11 ("Currently, NC [Highway] 12 from Bodie Island is the only free route available to access Hatteras Island."). NCDOT and FHWA nonetheless performed toll analyses and concluded that tolls were not a workable solution for the Pamlico Sound Corridor alternative. *Id.* Furthermore, toll revenues would provide only partial funding for the project, which would require other revenue sources to fill in this funding gap. AR075710-11. Lastly, it was determined that tolling would not make for a prudent business decision as the estimated toll revenue "is not going to be sufficient to warrant the financial rating necessary to allow debt financing of this project." AR082447.

Contrary to plaintiffs' argument, the agencies were not required to pursue or secure statutory changes in order to make the Pamlico Sound Corridor prudent.

48

There is no requirement under Section 4(f) that the agencies lobby for legislation or speculate as to increased revenues.  Plaintiffs cite *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800 (9th Cir. 1999) (Pls. Br. 53), but that case does not even address Section 4(f).  In *Muckleshoot*, the court explained that the agencies violated NEPA because they summarily failed to consider alternatives which required legislative action.  *Id.* at 814.  That factual scenario is inapposite to the facts here.  As the environmental documents plainly show, NCDOT and FHWA thoroughly studied the Pamlico Alternative in detail in the supplemental draft EIS, final EIS, and EA.  *Supra* at 12-18; AR031741-61, 058381-401, 083418-20.  Only after several years of detailed study and determinations that the Pamlico Sound Corridor alternative was neither "practicable" nor "prudent" was it dropped.  AR075576.

Plaintiffs also rely on *Coalition for Responsible Regional Development v. Brinegar*, 518 F.2d 522 (4th Cir. 1975), but that case is readily distinguished as well.  There, a West Virginia law expressly tied "funding of the bridge by the issuance of bonds" to its construction "in the vicinity of 24th Street to 31st Street in the City of Huntington," thus ruling out any other location other than the one favored by the State's legislature.  *Id.* at 524.  By contrast, there is no statute here that explicitly restricts funding for the project to a legislatively predetermined route.  Moreover, what the Fourth Circuit found fatally missing in *Responsible*

49

*Regional Development* – a showing that the State could not finance construction of the bridge from other sources or that the cost of building a bridge at the plaintiff's preferred location would be of "extraordinary magnitude," *id.* at 526 – is present here. As outlined above, the agencies objectively evaluated multiple funding arrangements, ultimately concluding that extraordinary costs and collateral effects on the rest of the State's highway system made the Pamlico Sound Corridor an imprudent alternative. AR075714.

The Pamlico Sound Corridor alternative entails not only extraordinary costs, but also "other unique problems or unusual factors." 23 C.F.R. § 774.17. Examples of "other unique problems or unusual factors" include the substantial degradation of the State's bridges and roadway system. AR075704. In addition, "[t]he Pamlico Sound Bridge Corridor Alternatives would also result in severe adverse impacts to access to the Refuge." AR075714. The 2.7 million annual visitors to the Refuge would be impacted by eliminating vehicular access from the north end of the Refuge. AR075712-14.

In the end, FHWA and NCDOT have the particular expertise in gauging how to best maintain and improve the public's transportation network within given fiscal constraints. Deference should be accorded the agencies' decisions concerning such matters. *See Webster*, 685 F.3d at 430 ("the weighing of a project's benefits with its costs lies at the core of an agency's discretion"); *Ohio*

50

*Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)

("Especially in matters involving not just simple findings of fact but complex

predictions based on special expertise, 'a reviewing court must generally be at its

most deferential.'") (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def.*

*Council*, 462 U.S. 87, 103 (1983)); *Prairie Band Pottawatomie Nation v. FHWA*,

684 F.3d 1002, 1016 (10th Cir. 2012) ("More recently, our circuit and others

following *Overton Park* have emphasized the discretion agencies exercise in

conducting 4(f) analyses, particularly in determining the prudence of

alternatives.").  FHWA's determination here that the Pamlico Sound Corridor

alternative was not prudent was supported by substantial evidence in the record

and was not arbitrary or capricious.

### C.  The Selected Alternative Complies with the "All Possible Planning" and "Least Overall Harm" Requirements.

When an agency has properly exhausted its inquiry into "feasible and

prudent" alternatives to using Section 4(f) property, the agency must select, from

among the remaining alternatives that do result in a "use," the alternative that

causes "least overall harm in light of the statute's preservation purpose" and must

employ "all possible planning to minimize harm."  49 U.S.C. § 303(c)(2); 23

C.F.R. § 774.3(c)(1), (c)(2).

"All possible planning," as defined by regulation, "means that all reasonable

measures identified in the Section 4(f) evaluation to minimize harm or mitigate for

51

adverse impacts and effects must be included in the project."  23 C.F.R. § 774.17.

Such "reasonable measures" may include "design modifications . . . . replacement

of land or facilities of comparable value and function . . . [or measures] to preserve

the historic activities, features, or attributes of the site . . . ."  *Id.*  "Under § 4(f),

agency determinations that a particular plan minimizes harm . . . deserve even

greater deference than agency determinations concerning practicable alternatives."

*Conservation Law Found.*, 24 F.3d at 1476-77; *see also, e.g., Druid Hills Civic*

*Ass'n v. FHWA*, 772 F.2d 700, 716 (11th Cir. 1985); *Coal. on Sensible Transp.*,

826 F.2d at 65-66.  Plaintiffs thus bear a heavy burden in challenging an agency's

decision as to harm minimization.  *See, e.g., Citizens Against Burlington, Inc. v.*

*Busey*, 938 F.2d 190, 204 (D.C. Cir. 1991).

　　　At issue here is the agencies' choice among the Parallel Corridor

alternatives, because Pamlico Sound alternatives were determined not to be

prudent, as explained above.  Plaintiffs posit that the selected alternative violates

the "all possible planning" requirement "because it avoids any planning beyond

'Phase I.'"  Pls. Br. 45.  As explained above, this is wrong: just like the EIS and

EA, FHWA's Section 4(f) evaluation addressed the entire project, both replacing

the bridge and the options for maintaining Highway 12.  *Supra* at 16-17;

AR075582-90.

Moreover, plaintiffs fail to support their argument that the Section 4(f) planning was deficient. Here, as recognized by the district court, the Section 4(f) planning process yielded a wide range of mitigation commitments – i.e., "all reasonable measures" – applicable to the selected alternative. AR075582-90 (discussing mitigation for Seashore, Refuge, and historic sites). The ROD, moreover, states that "[m]easures to minimize harm associated with the Selected Alternative include both those that are incorporated in most transportation improvement projects, such as relocation services and wetland compensation, as well as 28 project-specific commitments."[10] AR091976; *see also* AR091988-96 (listing 28 commitments). The extensive commitments reflect the long history of coordination among the Merger Team partners. *See* JA ___ (Order at 40: ("[T]hroughout the development of the Project, the Merger Team process served to identify all possible planning to minimize harm to Section 4(f) properties."); *see also* AR075582 (Merger Process and Partnership Agreement "serve as a framework for identifying all possible planning to minimize harm"). At the end of the process, the United States Department of the Interior and the North Carolina State Historic Preservation Officer – i.e., the agencies with jurisdiction over the

---

[10] For instance, mitigation measures include: "commitments regarding sedimentation and erosion control methods, disposal of dredged material, surveys for seabeach amaranth habitat, avoidance of piping plover bird closure areas and sea turtle nests within the Seashore and Refuge, prohibiting repair work on bridge structures during piping plover and sea turtle nesting seasons, and avoiding and minimizing wetland impacts." JA ___ (Order at 40).

53

Section 4(f) properties – signed off on FHWA's Section 4(f) plans to minimize harm. AR092066-67, 092100-16. The Selected Alternative, "more so than any other alternative, allows for implementation of strategies that will minimize harm to the Section 4(f) resources." AR075582.

Further, a Programmatic Agreement signed by FHWA, NCDOT, the North Carolina State Historic Preservation Officer, and the Advisory Council on Historic Preservation contains numerous measures to minimize harm with respect to the Refuge as a historic property. AR075586, 091977, 091982, 092102-17. The terms of the agreement include offering the North Carolina State Historic Preservation Officer, the United States Fish and Wildlife Service, and the National Park Service an opportunity to review and comment on the plans and specifications for Highway 12; requiring NCDOT to develop and implement sustainable techniques to protect Highway 12 in consultation with FHWA, the United States Fish and Wildlife Service, the National Park Service, the North Carolina State Historic Preservation Officer, and the North Carolina Coastal Geological Cooperative; and a commitment to utilizing the best practices and measures available at the time of construction to minimize all impacts to historic properties. AR075586-87. Moreover, if a later phase of construction requires the use of Section 4(f) property, additional Section 4(f) analysis would be undertaken before the agency approves the later phase. AR075590.

54

Plaintiffs equate the planning in this case with that in *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 (2d Cir. 1972) (Pls. Br. 45-46), but the agency's study in *Monroe County* consisted only of a "two and one-half page statement." *Id.* at 697, 699-700. Here, the agencies prepared more than 3,000 pages of environmental documentation, including hundreds of pages addressing the selected alternative, over 19 years. *Supra* at 10 n.2; JA ___ (Order at 6). And while the mitigation in *Monroe County* was not made "a condition of [the Secretary's] approval," 472 F.2d at 700, the ROD here expressly incorporates a series of mitigation measures pertaining to construction throughout the selected alternative's Parallel Corridor. AR091976-80, 091988-96; AR091983 (ROD: "Federal-aid highway funding for the project is expressly conditioned upon NCDOT's compliance with the terms and conditions of all [United States Department of the Interior] permits issued for the project"). In addition, "[a]dditional measures to minimize harm may be developed during the environmental permit process for Phase I and as future phases of the Selected Alternative are finalized." AR091976. By making clear that the agencies will continue to minimize harm, the ROD commits the agencies to reducing impacts to the greatest extent practicable. It does not indicate that the agencies' planning is deficient, as plaintiffs claim.

55

In addition to having no viable claim under the "all possible planning" provision, plaintiffs fail to show that the agency misapplied the balancing test under 23 C.F.R. § 774.3(c)(1) to arrive at the alternative causing least overall harm. The "least overall harm" determination is to be made by balancing the following factors:

> (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
>
> (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
>
> (iii) The relative significance of each Section 4(f) property;
>
> (iv) The views of the official(s) with jurisdiction over each Section 4(f) property;
>
> (v) The degree to which each alternative meets the purpose and need for the project;
>
> (vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
>
> (vii) Substantial differences in costs among the alternatives.

23 C.F.R. § 774.3(c)(1)(i)-(vii).

Plaintiffs ignore FHWA's well-reasoned conclusion that the selected alternative is in fact least harmful because it provides the best opportunity to mitigate impacts and respond to the dynamic coastal environment. AR075576-82. This determination is based on agency expertise and is entitled to deference. *See*

56

*Baltimore Gas*, 462 U.S. at 103.  And plaintiffs make no case that there was another Parallel Corridor alternative which on balance would have been less harmful than the selected alternative.

### D.   The Record of Decision is Supported by a Complete, Thorough, and Lawful Section 4(f) Evaluation.

Deviating from their argument below and citing a string of cases never presented to the district court – *San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971), *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999), *North Idaho Community Action Network v. USDOT*, 545 F.3d 1147 (9th Cir. 2008), and *Monroe County Conservation Council v. Volpe*, 472 F.2d 693 (2d Cir. 1972) – plaintiffs assert a new claim:  that Section 4(f) was violated because the Section 4(f) evaluation was allegedly incomplete at the time of the ROD.  Pls. Br. 44 (arguing that FHWA has "avoid[ed] all Section 4(f) compliance for the remainder of the Project until after issuance of the ROD").  In effect, they attempt to repackage their NEPA segmentation claim as a Section 4(f) claim.  This argument has no merit.  This Court should either decline to address it or otherwise reject it.  *See Dist. Mem'l Hosp. of Southwestern N.C., Inc. v. Thompson*, 364 F.3d 513, 520 (4th Cir. 2004) ("[litigant] did not make this argument . . . before the district court, and we will not entertain it for the first time on appeal"); *Muth v. United States*, 1 F.3d 246, 250

(4th Cir. 1993) ("As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered.").

In any event, the record does not support plaintiffs' contention.  Just as the entire project was subjected to an end-to-end analysis for purposes of NEPA, the project received thorough, end-to-end vetting pursuant to the requirements of Section 4(f).  When NCDOT and FHWA selected a preferred alternative, they did so after FHWA had completed *two* Section 4(f) evaluations – the 2008 final and the 2009 revised final.  Those evaluations both documented the application of Section 4(f) to the entire corridor from Bodie Island to Rodanthe.  AR075563, 058796-806; *see also, e.g., See Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 991 (6th Cir. 1989) (analyzing Section 4(f) segmentation argument using NEPA segmentation framework).

The record unambiguously demonstrates that FHWA performed all of the tasks required by Section 4(f).  FHWA identified all Section 4(f) properties along the corridor, AR058797-806, 075562; described how all the alternatives "use" the Section 4(f) properties, AR058806-18, 075562-74; investigated feasible and prudent alternatives that would not "use" these properties, AR058818-22, 075574-76; analyzed potential alternatives and identified the alternative that does the "least overall harm," AR058822-40, 075576-82;  and disclosed "all possible planning to minimize harm," AR058853-54, 075582-89.  For example, the Section 4(f)

58

analysis addresses the use, alternatives, and minimization of harm to Rodanthe Historic District and Chicamacomico Lifesaving Station, which are Section 4(f) properties at the southern end of the project area more than 13 miles south of Oregon Inlet. AR075570-71. The programmatic agreement provides mitigation for those properties. AR092108.

Plaintiffs' position also has no support in the case law. The cases cited by plaintiffs all address situations where the agency did not analyze the entire project under Section 4(f) (and NEPA). For example, in *San Antonio Conservation Soc'y*, an expressway project was split into three segments – a northern end, a southern end, and a controversial middle section that ran through Section 4(f) parkland – and then performed NEPA and Section 4(f) analysis of only the two end segments. 446 F.2d at 1016-17. By contrast, the agencies extensively analyzed the entire corridor here pursuant to NEPA and Section 4(f).

Similarly, in *Corridor H Alternatives* and *North Idaho Community Action Network*, the agency authorized the project before complete identification of the historic sites entitled to protection under Section 4(f)). 166 F.3d at 373; 545 F.3d at 1158-59. In contrast, FHWA here fully surveyed and evaluated all protected properties within the entire study corridor and then authorized the project only after the complete survey and evaluation.

59

\*   \*   \*

In sum, plaintiffs cannot demonstrate that FHWA's findings under Section 4(f) – whether related to "all possible planning," "least overall harm," "feasible and prudent" avoidance alternatives, or "joint planning" – were arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

ETHAN G SHENKMAN
 Acting Principal Deputy Assistant
 Attorney General

Of Counsel:                          /s/ Robert J. Lundman
MICHELLE ANDOTRA                ANDREW C. MERGEN
DIANE K. MOBLEY                   BEVERLY F. LI
Office of Chief Counsel             ROBERT J. LUNDMAN
Federal Highway                       U.S. Department of Justice
Administration                         Environment & Natural Resources Div.
U.S. Dept. of Transportation       P.O. Box 7415
                                     Washington, DC 20044
                                     Phone: (202) 514-2496
                                     Fax: (202) 353-1873
                                     robert.lundman@usdoj.gov

                                     THOMAS G. WALKER
                                       United States Attorney
                                       Eastern District of North Carolina

                                     MATTHEW L. FESAK
                                       Assistant U.S. Attorney
                                       310 New Bern Avenue
                                       Federal Building, Suite 800
                                       Raleigh, NC  27601-1461

                                     *Attorneys for Federal Highway Administration
                                     and John F. Sullivan, III, Division Administrator,
                                     Federal Highway Administration*

61

ROY COOPER
 Attorney General of North Carolina

JOHN F. MADDREY
 Solicitor General of North Carolina

/s/ Thomas D. Henry
SCOTT T. SLUSSER
 Special Deputy Attorney General
THOMAS D. HENRY
 Assistant Attorney General
COLIN A. JUSTICE
 Assistant Attorney General
 N.C. Department of Justice
 1505 Mail Service Center
 Raleigh, NC 27699-1505
 Phone: (919) 707-4480
 Fax: (919) 733-9329
 Email: thenry@ncdoj.gov

*Attorneys for North Carolina Department of Transportation and Anthony J. Tata, Secretary, North Carolina Department of Transportation*

January 17, 2014
90-1-4-13479

62

## CERTIFICATE OF COMPLIANCE
## WITH TYPE AND VOLUME LIMITATIONS

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains

13,560 words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)B)(iii), as counted by Microsoft Office Word 2007.

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface (14-point Times New

Roman) using Microsoft Office Word 2007.

/s/ Robert J. Lundman
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
Phone: (202) 514-5316
Fax: (202) 353-1873
robert.lundman@usdoj.gov

January 17, 2014

63

## CERTIFICATE OF SERVICE

I certify that on January 17, 2014, the foregoing brief was served on all

parties or their counsel of record through the CM/ECF system.

/s/ Robert J. Lundman
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
Phone: (202) 514-5316
Fax: (202) 353-1873
robert.lundman@usdoj.gov